SUPREME COURT OF ARIZONA

| | |
|---|---|
| MARK V. SCHEEHLE,<br><br>                   Plaintiff,<br><br>          v.<br><br>JUSTICES OF THE SUPREME COURT<br>OF THE STATE OF ARIZONA:<br>STANLEY G. FELDMAN, CHARLES E.<br>JONES, FREDERICK J. MARTONE,<br>RUTH V. McGREGOR, and THOMAS A.<br>ZLAKET; JUDGES OF THE SUPERIOR<br>COURT OF THE STATE OF ARIZONA,<br>IN AND FOR THE COUNTY OF<br>MARICOPA: MICHAEL R. McVEY,<br>ROBERT D. MYERS, JONATHAN H.<br>SCHWARTZ and CHRISTOPHER M.<br>SKELLY,<br><br>                Defendants. | Arizona Supreme Court<br>No. CV-04-0103-CQ<br><br>United States District<br>Court<br>No. CIV-98-1095-PHX-SMM<br><br><br>**O P I N I O N** |

Certified Question from the
United States District Court for the District of Arizona
The Honorable Stephen M. McNamee, Chief Judge

**QUESTION ANSWERED**

---

MARK V. SCHEEHLE                                  Fountain Hills
Plaintiff Pro Se

TERRY GODDARD, ARIZONA ATTORNEY GENERAL          Phoenix
    By   Paula S. Bickett, Chief Counsel, Civil Appeals
Attorneys for Defendants

---

**S N O W, Judge**

¶1      The United States District Court for the District of Arizona has asked us whether this Court "can promulgate court rules mandating experienced attorneys to serve as arbitrators in light of

the statutory language of Arizona Revised Statutes ("A.R.S.") section 12-133 (2000) authorizing only voluntary service?" We have jurisdiction to decide the certified question pursuant to A.R.S. § 12-1861 (2001).[1]

¶2       We hold that this Court has authority to promulgate a court rule authorizing the superior courts in each county of this state to require active members of the state bar to provide limited service as arbitrators. We further hold that the exercise of that authority is neither constricted by, nor inconsistent with, A.R.S. § 12-133.

## FACTS AND PROCEDURAL HISTORY

¶3       In 1971, the legislature passed a statute permitting the superior courts to implement by court rule non-binding mandatory arbitration programs. The statute assigned to the courts the responsibility for appointing arbitrators in such cases and further specified that courts opting to create a mandatory arbitration program "shall maintain a list of qualified persons within its jurisdiction who have agreed to serve as arbitrators, subject to the right of each person to refuse to serve in a particular

---

[1]       The district court also requested that we determine whether the Maricopa County Superior Court had authority under A.R.S. § 12-133 to promulgate a program mandating experienced attorneys to serve as arbitrators. Because, as we explain in this opinion, the Supreme Court Rule explicitly authorizes the superior court to include active members of the Arizona bar on its list of eligible arbitrators, this question is not presented by the facts of this case. We thus decline to answer it.

2

assigned case."[2] 1971 Ariz. Sess. Laws, ch. 142, § 1 (current version codified at A.R.S. § 12-133(C) (2003)). The legislature has amended the statute several times, to raise the mandatory arbitration limits and to require, as opposed to merely permit, superior courts to create mandatory arbitration programs, among other reasons. *See, e.g.,* 1978 Ariz. Sess. Laws, ch. 35, § 1; 1984 Ariz. Sess. Laws, ch. 53, § 1; 1986 Ariz. Sess. Laws, ch. 360, § 1; 1991 Ariz. Sess. Laws, ch. 110, § 1; 1992 Ariz. Sess. Laws, ch. 9, § 1; 2000 Ariz. Sess. Laws, ch. 35, § 1.

¶4        In 1974, this Court promulgated the Uniform Rules of Procedure for Arbitration. Rule 1 indicated that the Uniform Rules were for those superior courts that implemented a mandatory arbitration program under A.R.S. § 12-133, and further directed the superior courts how to enact rules for such programs. Rule 2 specified how arbitrators would be appointed. That rule provided that if the parties could not stipulate to an arbitrator, the court would, through a random selection procedure, appoint an arbitrator from a list. The list would be comprised of "members of the Bar of the State of Arizona residing within the County in which the Court is located."[3] Unif. R.P. Arb. 2(b) (1980). The rule allowed

---

[2]        The statute also provided that an arbitrator be paid fifty dollars per day for conducting an arbitration hearing. The statute has since been amended to raise the payment to seventy-five dollars per day. A.R.S. § 12-133(G).

[3]        This rule and its successor, Arizona Rule of Civil Procedure 73, have been modified several times. Rule 73 currently

3

attorneys to remove their names from the list and also allowed them to refuse to serve if appointed as an arbitrator.

¶5        In 1984, pursuant to the rule and the statute, Maricopa County added a local rule implementing the mandatory arbitration program.[4]

¶6        In 1986, the legislature amended the statute to require, as opposed to merely permit, superior courts to implement mandatory arbitration programs by rule.  In 1989 and 1990, the State Bar of Arizona, the Maricopa County Superior Court, and other attorneys, judges, and court administrators, petitioned this Court to remove the provisions from Rule 2 allowing attorneys to opt out of arbitration service absent good cause.  In response, we adopted four changes to Rule 2.  First, we omitted the provisions allowing practicing attorneys to remove their names from the list of potential arbitrators.  Second, we specified the reasons that would permit an arbitrator to be excused from service.  Third, we added a provision allowing an attorney who "has served as an Arbitrator

provides that "all residents of the county in which the court is located, who, for at least four years, have been active members of the State Bar of Arizona" may be placed on a county's list of eligible arbitrators.  Ariz. R. Civ. P. 73(b)(1).  It also permits the superior court to place on this list other lawyers of any bar, both active and inactive, who "have agreed to serve as arbitrators in the county where the action is pending."  Ariz. R. Civ. P. 73(b)(2).

[4]        The Maricopa County Superior Court initially set the mandatory arbitration threshold at $15,000.  Ariz. Local R. Prac. Super. Ct. (Maricopa) 3.10 (1984).  In 1994 it adopted the $50,000 maximum threshold authorized by A.R.S. § 12-133.

4

pursuant to these Rules for two or more days during the current year to be excused."[5] Unif. R.P. Arb. 2(e)(3) (1992). Fourth, we added a comment to the rule confirming that "[i]t is the obligation of all qualified lawyers to serve as Arbitrators and only exceptional circumstances should justify removal from the list." Unif. R.P. Arb. 2 cmt. (1992). In 2000, the Uniform Rules for Arbitration were incorporated into the Arizona Rules of Civil Procedure as Rules 72-76. Rules 1 and 2 of the Uniform Rules are now renumbered respectively as Arizona Rules of Civil Procedure 72 and 73.[6]

¶7     In this case, attorney Mark V. Scheehle challenges the provision of Rule 73 authorizing the Maricopa County Superior Court to include him on its list of eligible arbitrators without his consent. Scheehle's federal court complaint alleged that Rule 73 violated a number of his federal constitutional rights. Scheehle also raised a pendent state law claim that Rule 73 was invalid because it compelled him to serve as an arbitrator, whereas A.R.S. § 12-133 authorized the appointment only of arbitrators who had agreed to serve.

---

[5]     In 2000, this provision was amended to excuse an appointed arbitrator who had "completed contested hearings and ruled as an arbitrator . . . in two or more cases assigned during the calendar year." Ariz. R. Civ. P. 73(e)(3).

[6]     The balance of this opinion will refer to these rules as they are currently codified in the Arizona Rules of Civil Procedure.

5

¶8     The district court granted summary judgment against Scheehle on his federal civil rights claims.  It then declined to exercise supplemental jurisdiction over the state law claims after resolution of all the federal questions and accordingly dismissed the state law claims.  The Ninth Circuit initially affirmed the decision, *Scheehle v. Justices of the Supreme Court*, 257 F.3d 1082 (9th Cir. 2001), but then withdrew that opinion.  *Scheehle v. Justices of the Supreme Court*, 269 F.3d 1127 (9th Cir. 2001).  It then certified a question to this Court asking whether A.R.S. § 12-133 mandated compulsory participation of attorneys as arbitrators.

¶9     This Court, addressing only that very limited question, held that A.R.S. § 12-133 does not require that lawyers serve as arbitrators.  *Scheehle v. Justices of the Supreme Court*, 203 Ariz. 520, 522, ¶ 6, 57 P.3d 379, 381 (2002).  After our decision, the Ninth Circuit remanded the case to the district court for further consideration.  *Scheehle v. Justices of the Supreme Court*, 315 F.3d 1191 (9th Cir. 2003).

¶10    Upon remand, the district court again reaffirmed its rejection of Scheehle's federal constitutional arguments and dismissed them from this case.

¶11    In the same order, the district court certified the following question to this Court:

> Whether the Arizona Supreme Court under its
> exclusive constitutional authority to regulate
> the practice of law can promulgate court rules

6

mandating experienced attorneys to serve as arbitrators in light of the statutory language of A.R.S. § 12-133 authorizing only voluntary service?

The district court stayed all further consideration as to Scheehle's state law claim pending the answer to its certified question.[7]

## ANALYSIS

¶12 In his briefing on the certified question, Scheehle makes three alternative arguments. First, Scheehle argues that Rule 73 violates the Takings Clause, U.S. Const. amend. V, and the Equal Protection Clause, U.S. Const. amend. XIV. Second, he argues that Rule 73 impermissibly conflicts with the legislation authorizing the mandatory arbitration program. Third, he asserts that this Court's power to regulate the practice of law does not extend to compelling attorneys to serve as arbitrators. We analyze each argument in turn.

### A. The District Court Has Already Decided Scheehle's Federal Law Claims.

¶13 Scheehle acknowledges that the district court has already dismissed his federal constitutional claims. But he nonetheless asserts that it would be improper for this Court "to answer the

---

[7] Upon certification, Scheehle objected to the participation of Justices McGregor, Berch, Ryan, and Hurwitz in answering the certified questions because they are defendants in the underlying federal court complaint. We considered and rejected Scheehle's objections in a previous order that is appended to this decision and incorporated herein.

7

certified questions, when the district court seeks answers from this Court devoid of any analysis of the impact of the Constitution of the United States on such state law authority." We disagree.

¶14 It is not the role of this Court in responding to a certified question of state law to review the federal law rulings of the certifying federal court. The authority pursuant to which we respond to the district court's questions permits us to answer only questions of state law. A.R.S. § 12-1861 ("The supreme court may answer questions of law certified to it . . . if there are involved in any proceedings before the certifying court questions of the law of this state which may be determinative of the cause."). This opinion is thus limited to the question certified: Does this Court have authority under state law to promulgate the rules at issue and, if it does, is that authority limited by the provisions of A.R.S. § 12-133?

**B. Rule 73 Does Not Conflict with A.R.S. § 12-133.**

¶15 Scheehle next contends that A.R.S. § 12-133(C), by requiring each superior court to "maintain a list of qualified persons within its jurisdiction who have agreed to serve as arbitrators," limits the court to appointing arbitrators from that list. A.R.S. § 12-133(C). We disagree.

¶16 In interpreting a statute, we "try to determine and give effect to the legislature's intent." *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 268, 872 P.2d 668, 672 (1994). If we cannot do so by

8

looking at the plain language of the statute, "we consider the statute's context; its language, subject matter, and historical background; its effects and consequences; and its spirit and purpose." *Id.* We also avoid interpretations that unnecessarily implicate constitutional concerns. *In re Shannon,* 179 Ariz. 52, 78, 876 P.2d 548, 574 (1994) (opting for statutory interpretation that does not limit this court in interpreting range of sanctions it could impose on attorneys so as not to implicate constitutional concerns); *Hayes,* 178 Ariz. at 273, 872 P.2d at 677.

¶17    The language upon which Scheehle relies has been in A.R.S. § 12-133 since its adoption in 1971. The full text of the relevant provision states:

> The court shall maintain a list of qualified persons within its jurisdiction who have agreed to serve as arbitrators, subject to the right of each person to refuse to serve in a particular assigned case and subject further to the right of any party to show good cause why an appointed arbitrator should not serve in a particular assigned case. The court rules shall provide that the case subject to arbitration shall be assigned for hearing to a panel of three arbitrators, or in the alternative, to a single arbitrator, each of whom shall be selected by the court.

A.R.S. § 12-133(C).

¶18    Scheehle argues that under this statute the list of voluntary arbitrators is the only source from which the superior court may appoint arbitrators. Nowhere, however, does the statute say so. Rather, the plain text of the statute vests in the

9

superior court the authority, without limit, to select each arbitrator. "The court rules shall provide that the cases subject to arbitration shall be assigned . . . to [an arbitrator or arbitrators] . . . each of whom shall be selected by the court." A.R.S. § 12-133(C).

¶19     While implying a limitation not explicitly stated in a statute may be appropriate in some circumstances, it is not in this case for several reasons. First, the legislature has been aware since 1974 that this Court, by rule, authorized superior courts to place active members of the bar on their lists of eligible arbitrators. After we promulgated the rule, the legislature repeatedly amended the statute, but never indicated that the court could appoint only arbitrators who volunteered. We, therefore presume that the legislature approved of the rule's operation. As we have said in the context of statutory interpretation:

> It is universally the rule that where a statute which has been construed by a court of last resort is reenacted in the same or substantially the same terms, the legislature is presumed to have placed its approval on the judicial interpretation given and to have adopted such construction and made it part of the reenacted statute.

State v. Superior Court of Pima County, 104 Ariz. 440, 442, 454 P.2d 982, 984 (1969) (quoting Madrigal v. Indus. Comm'n, 69 Ariz. 138, 142, 210 P.2d 967, 971 (1949)).

¶20     After this Court promulgated the rule authorizing superior courts to appoint active members of the bar as

10

arbitrators, the legislature amended the statute both to increase the jurisdictional limit on cases that must be referred to mandatory arbitration and to require, as opposed to merely authorize, each superior court to adopt a mandatory arbitration program. In doing so the legislature must have anticipated a corresponding increase in the demand for arbitrators. Yet it made no provision for additional arbitrators. We therefore presume that the legislature relied on this Court's rule authorizing the service of the members of the bar as arbitrators to meet that demand.

¶21 Second, nothing in the statute seeks to regulate attorneys. To imply in the statute a limitation on the court's power of appointment would limit not only a superior court's power to appoint arbitrators but also the scope of this Court's power to require bar members to assist in the administration of justice by authorizing superior courts, on a limited basis, to appoint members of the bar as arbitrators. We do not interpret a statute as intending to limit the court's ability to otherwise act unless the legislature explicitly indicates such an intent. *Hayes,* 178 Ariz. at 273, 872 P.2d at 677. None is evident here.

¶22 As Scheehle acknowledges, this Court has exclusive authority over the regulation of attorneys. "[T]he practice of law is a matter exclusively within the authority of the Judiciary. The determination of who shall practice law in Arizona and under what condition is a function placed by the state constitution in this

11

court." *Hunt v. Maricopa County Employees Merit Sys. Comm'n*, 127 Ariz. 259, 261-62, 619 P.2d 1036, 1038-39 (1980).[8]

¶23 This Court fulfills the administrative responsibilities assigned to it under the constitution by, among other methods, promulgating rules. Those rules are distinct from those enacted by state administrative agencies pursuant to legislation. When this Court promulgates rules pertaining to attorneys or to court procedures, it does so pursuant to its own constitutional authority over the bench, the bar, and the procedures pertaining to them. *Heat Pump Equip. Co. v. Glen Alden Corp.*, 93 Ariz. 361, 363, 380 P.2d 1016, 1017 (1963) (stating that courts have constitutional power to promulgate rules on judicial matters); *Burney v. Lee*, 59 Ariz. 360, 363, 129 P.2d 308, 309 (1942) (courts have power to promulgate rules to fulfill constitutional mandates).

¶24 Such rules are valid even if they are not completely cohesive with related legislation, so long as they are an appropriate exercise of the court's constitutional authority. Although the legislature may, by statute, regulate the practice of law, such regulation cannot be inconsistent with the mandates of this Court. *Creasy*, 198 Ariz. at 544, ¶ 18, 12 P.3d at 219

---

[8] Since the early days of statehood, we have recognized that our constitution gives authority to this Court to regulate the practice of law. *See, e.g.*, *State Bar of Ariz. v. Ariz. Land Title & Trust Co.*, 90 Ariz. 76, 366 P.2d 1 (1961); *In re Miller*, 29 Ariz. 582, 244 P. 376 (1926); *In re Bailey*, 30 Ariz. 407, 248 P. 29 (1926).

12

(stating that legislature cannot authorize by statute activity that would result in the unauthorized practice of law because a court rule governing the practice of law "trumps statutory law"); *see also Ariz. Land Title & Trust Co.*, 90 Ariz. at 95, 366 P.2d at 14 ("although the legislature may impose additional restrictions which affect the licensing of attorneys, it cannot infringe on the ultimate power of the courts to determine who may practice law") (citing *In re Greer*, 52 Ariz. 385, 389-90, 81 P.2d 96, 98 (1938)); *Conway*, 60 Ariz. at 81, 131 P.2d at 988 ("When, however[,] it appears that the legislative rule unduly hampers the court in the duties imposed upon it by the Constitution, the rule adopted by the court will prevail.").

¶25 We are reluctant to imply a statutory limitation that would create a conflict in the constitutional prerogatives of separate branches of Arizona government. *Shannon*, 179 Ariz. at 78, 876 P.2d at 574; *Hayes*, 178 Ariz. at 273, 872 P.2d at 677. Scheehle's proposed interpretation would unnecessarily create such a conflict.

¶26 We therefore hold that A.R.S. § 12-133 does not limit the court's right to appoint persons other than volunteers to serve as arbitrators.

13

**C. This Court's Responsibility to Administer an Integrated Judicial System Gives it Authority to Promulgate Rules Requiring Limited Service by Attorneys to the Judiciary.**

¶27     Scheehle finally argues that the power to regulate the practice of law does not permit this Court to oblige attorneys to serve as court-appointed arbitrators because appointing such arbitrators "is not a function of regulating the practice of law." This argument reflects a misunderstanding of the constitutional basis from which this Court derives its power to regulate the practice of law.[9]  This Court's power to regulate the practice of law is a function of its responsibility to administer an integrated judiciary.  The power to administer the judicial branch allows this Court to regulate the practice of law to further the administration of justice.

¶28     Article 6, section 1 of our constitution vests the judicial power "in an integrated judicial department," which includes all of the courts of this state.  Because "the practice of law is so intimately connected and bound up with the exercise of judicial power in the administration of justice . . . the right to

---

[9]     Wholly apart from the power to regulate the bar given by our state constitution to the judiciary, extensive authority supports the inherent authority of the courts to regulate the practice of law.  *Shannon*, 179 Ariz. at 75, 876 P.2d at 571 ("The judiciary's authority to regulate and control the practice of law is universally accepted and dates back to the year 1292."); *Bridegroom v. State Bar*, 27 Ariz. App. 47, 49, 550 P.2d 1089, 1091 (1976) ("There is no question but that the Supreme Court has inherent power to integrate the bar of this state.") (citations omitted).

14

define and regulate its practice naturally and logically belongs to the judicial department." *Shannon*, 179 Ariz. at 76, 876 P.2d at 572 (quoting *In re Integration of Neb. State Bar Ass'n*, 275 N.W. 265, 268 (1937)).

¶29    Consequently, the Arizona Constitution's creation of an integrated judiciary gives to this Court the power not just to regulate all courts but also to regulate the practice of law. *Shannon*, 179 Ariz. at 76, 876 P.2d at 572; *see also Creasy*, 198 Ariz. at 541, ¶7, 12 P.3d at 216 ("The court's authority over the practice of law is also based on the creation of an integrated judicial department and the revisory jurisdiction of this court as provided in article VI sections 1 and 5(4) of the Arizona Constitution."); *In re Smith*, 189 Ariz. 144, 146, 939 P.2d 422, 424 (1997) ("The State Bar exists only by virtue of this court's rules, adopted under authority of article III and article VI, §§ 1 and 5 of the Arizona Constitution.").

¶30    The constitution's mandate in article 6, section 3 that this Court shall have "administrative supervision" over the courts of this state enables this Court to supervise judicial officers, including attorneys. "Administrative supervision contemplates managing the conduct of court personnel. . . . Attorneys are universally recognized as 'officers of the court,' . . . and as officers of the court, attorneys are amenable to the court as their superior." *Shannon*, 179 Ariz. at 76-77, 876 P.2d at 573 (citations

15

omitted); *Bailey,* 30 Ariz. at 412, 248 P. at 30 (quoting *In re Splane,* 16 A. 421 (Pa. 1889)) ("The attorney is an officer of the court, and is brought into close and intimate relations with the court.").

¶31    By virtue of our constitutional power over attorneys as officers of the court, this Court created the State Bar of Arizona. Ariz. R. Sup. Ct. 32(a)(1). We require those practicing law in this state to be members of this bar. Ariz. R. Sup. Ct. 31. As officers of the court, State Bar members are invested with significant rights and responsibilities. As the United States Supreme Court has observed:

> As an officer of the court, a member of the bar enjoys singular powers that others do not possess; by virtue of admission, members of the bar share a kind of monopoly granted only to lawyers. Admission creates a license not only to advise and counsel clients but to appear in court and try cases; as an officer of the court, a lawyer can cause persons to drop their private affairs and be called as witnesses in court, and for depositions and other pretrial processes that, while subject to the ultimate control of the court, may be conducted outside courtrooms.

*In re Snyder,* 472 U.S. 634, 644 (1985). Attorneys are invested with these powers because they have an individual and collective role in achieving "[t]he primary duty of courts [which] is the proper and efficient administration of justice." *Shannon,* 179 Ariz. at 76, 876 P.2d at 572 (quoting *In re Integration of Neb. State Bar Ass'n,* 275 N.W. at 268).

16

¶32     Contrary to Scheehle's argument, this Court's exclusive authority to regulate the practice of law is therefore not independent from its responsibility to supervise an integrated judiciary. It is derived from that very power. The power extended to this Court by the constitution includes the authority to promulgate regulations assigning limited quasi-judicial functions to lawyers as judicial officers.

¶33     Scheehle cites *Schware v. Board of Examiners of the State of New Mexico,* 353 U.S. 232, 239 (1957), and its progeny, for the proposition that any qualification a state places on the entry to the practice of law "must have a rational connection with the applicant's fitness or capacity to practice law." The obligation to perform limited service as an arbitrator, however, is not a restriction placed on the entry to the practice of law in this state. Rather it is a uniform regulation requiring limited service to the judiciary for those already admitted to practice relating to their roles as officers of that judiciary.

¶34     A state may engage in reasonable regulation of licensed professionals. *See, e.g., Lupert v. Cal. State Bar,* 761 F.2d 1325, 1328 (9th Cir. 1985) (citing *Williamson v. Lee Optical,* 348 U.S. 483, 487-89 (1955)); *Watson v. Md.,* 218 U.S. 173, 177 (1910); *see also Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 460 (1978). Our precedents involving attorney regulation underscore this point.

¶35     For example, this Court has rejected a challenge to its

17

constitutional authority to require annual continuing legal education ("CLE") as a condition of continued practice. *Smith*, 189 Ariz. at 146, 939 P.2d at 424; Ariz. R. Sup. Ct. 45. Compliance with the mandatory CLE rule generally requires not only that an attorney spend unreimbursed time attending the courses but also that the lawyer pay for the course. Nevertheless, we rejected a constitutional challenge to such a rule because, like the requirement to provide limited arbitration services to benefit the judiciary, "such requirements . . . are rationally related to the court's obligation to serve the public interest." *Id.*

¶36     An attorney's right "to pursue a profession is subject to the paramount right of the state . . . to regulate . . . professions . . . to protect the public . . . welfare." *Cohen v. State*, 121 Ariz. 6, 10, 588 P.2d 299, 303 (1978)(citing *Ariz. State Bd. of Dental Exam'rs v. Hyder*, 114 Ariz. 544, 546, 562 P.2d 717, 719 (1977)). In addition to exacting time and money to meet the continuing standards necessary to retain a license, the state may exact a reasonable consideration from those who are engaged in a profession that it regulates. *Duncan v. Truman*, 74 Ariz. 328, 332, 248 P.2d 879, 883 (1952) ("[A] 'license' is a 'permit, granted by the sovereign, *generally for a consideration* . . . to a person, firm, or corporation to pursue some occupation or to carry on some business subject to regulation.'") (quoting *State Bd. of Barber Exam'rs v. Walker*, 67 Ariz. 156, 167, 192 P.2d 723, 730 (1948))

18

(emphasis added). That consideration need not be exclusively monetary, but can also be in the form of limited service to the bench, bar, or community.

¶37 Scheehle, citing *Zarabia v. Bradshaw,* 185 Ariz. 1, 912 P.2d 5 (1996), argues that whatever this Court's authority to compel service from attorneys without adequate compensation in individual cases, it has no authority to enact rules that *systematically deprive* attorneys of their time, no matter how small the deprivation. We do not so read *Zarabia.*

¶38 In *Zarabia,* attorneys and defendants challenged Yuma County's procedures for providing criminal representation to indigent defendants. 185 Ariz. at 2, 912 P.2d at 6. At the time, Yuma County had no public defender's office and provided representation to indigent defendants in criminal cases through a mix of contract attorneys and attorneys appointed from the private bar. *Id.* The private practitioners were appointed on a rotational basis and were obliged to provide the representation regardless of experience or expertise. These lawyers were reimbursed "a total of $375 for up to twenty hours' work on a case ($17.50 per hour), and $50 an hour if more than twenty hours [were] required to complete the representation." *Id.* at 3, 912 P.2d at 7.

¶39 In reviewing that appointment system, we decided no constitutional questions. Rather we held that the system violated both A.R.S. § 13-4013, which requires that an attorney receive

19

"reasonable" compensation when appointed to represent an indigent criminal defendant, and Arizona Rule of Criminal Procedure 6.5(C), which requires that in appointing an attorney to represent a defendant in a criminal matter the court take "into account the skill likely to be required in handling a particular case." *Zarabia,* 185 Ariz. at 3, 912 P.2d at 7.

¶40     We expressly recognized in *Zarabia,* however, that the court has authority to require a lawyer's services, even on a pro bono basis, to assist in the administration of justice. "[N]othing we say here should be interpreted as limiting a judge's inherent authority to achieve justice by appointing a particular lawyer to represent a [party] in a particular case, even if the appointment is pro bono or causes financial hardship to the appointed lawyer." *Id.* at 4, 912 P.2d at 8. We thus confirmed, as have other courts, the ability of a court to require attorneys, by virtue of their office, to provide pro bono publico service in certain circumstances. *See, e.g., United States v. 30.64 Acres of Land,* 795 F.2d 796, 800 (9th Cir. 1986) ("Courts have long recognized that attorneys, because of their profession, owe some duty to the court and to the public to serve without compensation when called on . . . . This duty of public service is a condition of practicing law, and constitutes neither a taking under the fifth amendment, nor involuntary servitude under the thirteenth amendment.") (citations omitted); *see also United States v. Dillon,*

20

346 F.2d 633 (9th Cir. 1965) (the state can condition a lawyer's ability to practice law upon the acceptance of certain responsibilities in the furtherance of the administration of justice).

¶41     Stressing that such power was limited, however, we remarked upon the difference between "requiring a lawyer to handle one case or a few" and conscripting lawyers to handle "all cases regardless of their ability or willingness to do so." *Zarabia*, 185 Ariz. at 4, 912 P.2d at 8. We therefore noted that "[w]hatever appointment process a court adopts should reflect the principle that lawyers have the right to refuse to be drafted on a systematic basis and put to work at any price to satisfy a county's obligation to provide counsel to indigent defendants." *Id.*

¶42     Contrary to the appointment system in *Zarabia,* which was neither quantitatively nor qualitatively limited, the system authorized by Rule 73 contains several inherent limitations. First, Rule 73 does not, in and of itself, compel a lawyer to be an arbitrator. It merely authorizes superior courts to place attorneys on a list of eligible arbitrators. Thus, presumably, if sufficient volunteers exist in a particular county to meet that county's need for arbitrators, that county's superior court need not place eligible members of the state bar on the list of persons eligible for appointment.

¶43     Second, Rule 73 provides for random appointment of

21

arbitrators from the list. Thus, placement on the list does not necessarily result in service as an arbitrator in any given year.

¶44 Third, when a lawyer is randomly selected to serve, Rule 73 explicitly limits the extent of that service. Under Rule 73, an attorney cannot be compelled to accept arbitrations in any year in which the attorney has already held hearings and ruled on two matters. According to Scheehle's own affidavit, service as an arbitrator typically requires only four to eight hours of his time and imposes only minor out-of-pocket expenses. Because Scheehle was asked to serve twice in 1997, he would have provided no more than sixteen hours of arbitration service in that year. This simply does not constitute the systematic deprivation condemned in *Zarabia*.[10]

¶45 Citing *Hackin v. Lockwood*, 361 F.2d 499, 503 (9th Cir. 1966), Scheehle also argues that this Court cannot condition his practice of law on the deprivation of his constitutional rights. The district court, however, has already determined that no such rights were infringed upon here.

---

[10] When the annual time an attorney might be required to serve as an arbitrator is combined with the fifteen hours of continuing legal education an attorney is obliged to obtain, it is still well within the range of training hours required by state administrative agencies from other professionals. *See, e.g.*, A.A.C. R4-1-453(D) (requiring accountants to obtain between sixty and eighty hours of continuing education every two years); A.A.C. R4-26-207 (requiring psychologists to obtain sixty hours every two years); A.A.C. R4-11-1203 (requiring dentists to obtain seventy-two hours every three years); A.A.C. R4-16-101 (requiring physicians to obtain forty hours every two years).

22

**CONCLUSION**

¶46     We therefore answer the Certified Question as follows: This Court has the constitutional authority to require active members of the state bar to serve as arbitrators pursuant to Arizona Rules of Civil Procedure 73.  Further, A.R.S. § 12-133 does not restrict this Court's authority to promulgate that rule.

_____
G. Murray Snow, Judge[11]

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice

_____

[11]     The Honorable Charles E. Jones recused himself; pursuant to Article 6, Section 3, of the Arizona Constitution, the Honorable G. Murray Snow, Judge of the Court of Appeals, Division One, was designated to sit in his stead.

# SUPREME COURT OF ARIZONA

| | |
|---|---|
| MARK V. SCHEEHLE, | ) Arizona Supreme Court |
| | ) No. CV-04-0103-CQ |
| Plaintiff, | ) |
| | ) United States District |
| v. | ) Court |
| | ) No. CV-98-1095-PHX-SMM |
| JUSTICES OF THE ARIZONA SUPREME | ) |
| COURT OF THE STATE OF ARIZONA: | ) |
| STANLEY G. FELDMAN, CHARLES E. | ) **O R D E R** |
| JONES, FREDERICK J. MARTONE, | ) |
| RUTH V. McGREGOR, and THOMAS A. | ) |
| ZLAKET; JUDGES OF THE SUPERIOR | ) |
| COURT OF THE STATE OF ARIZONA, | ) |
| IN AND FOR THE COUNTY OF | ) |
| MARICOPA: MICHAEL R. McVEY, | ) |
| ROBERT D. MYERS, JONATHAN H. | ) |
| SCHWARTZ and CHRISTOPHER M. | ) |
| SKELLY, | ) |
| | ) |
| Defendants. | ) |
| | ) |

When this Court accepted questions certified to it by the United States District Court for the District of Arizona, Chief Justice Jones recused himself. Thereafter, the Plaintiff in the underlying federal action, Mark V. Scheehle, filed with this Court an "Objection to Defendants in Plaintiff's Federal Action Participating in the Adjudication of the Questions Certified to this Court by the District Court." In it, Mr. Scheehle argues that the remaining four permanent members of this Court, Justices McGregor, Berch, Ryan, and Hurwitz, are disqualified from answering the certified questions. We here decide that objection.

## FACTS AND PROCEDURAL HISTORY

The Maricopa County Superior Court assessed a $900 fine against Mr. Scheehle for his refusal to accept assignment as an arbitrator pursuant to court rules that require Arizona attorneys with more than five years' of experience to serve as arbitrators in matters in which a limited damage amount is at issue. Mr. Scheehle filed a special action in this Court challenging the fine and the right of the superior court to require his service as an arbitrator. This Court declined to exercise its special action jurisdiction. Thereafter, instead of seeking appellate review of the fine, Mr. Scheehle filed a civil rights complaint in federal court pursuant to 42 U.S.C. § 1983 (2000).

In his First Amended Complaint in the federal action, Mr. Scheehle named a number of defendants. Among them he named the superior court judge who had assessed the fine, several other judges of the superior court who enforced the arbitration program, the Maricopa County Superior Court, and "the Justices of the Arizona Supreme Court, Stanley G. Feldman, Charles E. Jones, Frederick J. Martone, Ruth V. McGregor, and Thomas A. Zlaket."

Although Mr. Scheehle sued all of the judges individually, he specified that the action was brought against them in their official capacities. Thus, he alleged, they were not immune from his federal civil rights action.

In the federal complaint, Mr. Scheehle attacked the

2

arbitration program on both constitutional and state law grounds. He asked for declaratory relief establishing that the Arizona statute and court rule implementing the program are unconstitutional. He also sought injunctive relief ordering the Maricopa County Superior Court to remove his name from the list of arbitrators and enjoining the court from enforcing the $900 sanction entered against him. He finally requested that he be awarded costs and his co-counsel's reasonable attorney fees pursuant to 42 U.S.C. § 1988(b) (2000).[1]

The district court entered summary judgment in the defendants' favor on all of Mr. Scheehle's § 1983 claims and declined to exercise supplemental jurisdiction over the State law claims. The Ninth Circuit initially affirmed, *Scheehle v. Justices of the Supreme Court*, 257 F.3d 1082 (9th Cir. 2001), but later withdrew the opinion. *Scheehle v. Justices of the Supreme Court*, 269 F.3d 1127 (9th Cir. 2001). The Ninth Circuit then certified a

---

[1]    Of course "[s]uits brought against individual officers for injunctive relief are for all practical purposes suits against the State itself." *Hutto v. Finney*, 437 U.S. 678, 700 (1978). The public officials sued are not personally liable for any attorneys' fees that might be awarded. *Id.; see also Scott v. Flowers*, 910 F.2d. 201, 213 (5th Cir. 1990) ("Any such [attorneys' fees] award, however, must be paid by the state and cannot be assessed against the defendants in their individual capacity, as the injunctive relief sought and won by Scott can be obtained from the defendants only in their official capacity as commissioners."); *Echols v. Parker*, 909 F.2d 795, 800 (5th Cir. 1990) (concluding State liable for attorneys' fees and costs under 42 U.S.C. § 1988 when county prosecutor, district attorney, and justice court judge were sued in official capacities as enforcing agents of an unconstitutional statute).

3

question to our Court asking whether Arizona Revised Statutes ("A.R.S.") section 12-133 (Supp. 2001) authorized a system of compulsory participation of attorneys in the mandatory arbitration system. *Scheehle v. Justices of the Supreme Court*, 203 Ariz. 520, 521, ¶ 1, 57 P.3d 379, 380 (2002).

After accepting jurisdiction of the certified question, all justices named in the complaint recused themselves. Their positions on this Court were filled for purposes of responding to the certified question by four judges from the Court of Appeals and a judge from the Yuma County Superior Court.[2] This Court then responded that A.R.S. § 12-133 does not authorize the creation of an arbitration system mandating lawyer participation. *Id.* at 522, ¶ 6, 57 P.3d at 381. The Ninth Circuit then remanded the case to the district court for further consideration in light of our answer. *Scheehle v. Justices of the Supreme Court*, 315 F.3d 1191 (9th Cir. 2003).

After remand, pursuant to A.R.S. § 12-1861 (2003), the district court certified the following state law question to this Court:

---

[2] These judges were the Honorable Edward C. Voss, Susan A. Ehrlich, John C. Gemmill, and Jefferson L. Lankford, of the Arizona Court of Appeals, Division One, and the Honorable Tom C. Cole, Presiding Judge of the Yuma County Superior Court. *Scheehle*, 203 Ariz. at 523 n.2, 57 P.2d at 382.

4

> Whether the Arizona Supreme Court under its exclusive constitutional authority to regulate the practice of law can promulgate court rules mandating experienced attorneys to serve as arbitrators in light of the statutory language of A.R.S. § 12-133 authorizing only voluntary service?

If the answer to the above question is in the affirmative, then the district court also requests that we answer the following question:

> Whether the Maricopa County Superior Court, pursuant to A.R.S. § 12-133, has authority independent from the Arizona Supreme Court, to promulgate a program mandating experienced attorneys to serve as arbitrators in light of statutory language that the superior courts "shall maintain a list of qualified persons . . . who have agreed to serve?"

The district court stayed all further consideration of Mr. Scheehle's state law claim pending the answer to these questions.

After the district court certified the questions to this Court, and before filing his objection, Mr. Scheehle filed with the district court a "Motion to Identify for the Record and to Notify the Arizona Supreme Court of Current Defendants and Counsel." In that motion, Mr. Scheehle noted that the caption on the action reflected the names of the individual defendants against whom he had originally brought suit, but who had left office since that time. He requested that the court update the caption and inform the individual members of this Court that, pursuant to the operation of the Federal Rules of Civil Procedure, they were

5

automatically substituted as defendants in this action. Mr. Scheehle noted that Federal Rule of Civil Procedure 25(d) provides that a public official sued in an official capacity is automatically replaced as a defendant in any action by his successor in office.

In denying Mr. Scheehle's motion to amend the caption, the district court acknowledged that because Mr. Scheehle only brought suit against the original defendants in their official capacities, the federal rule automatically substituted their successors as defendants in this case. Nevertheless it denied Mr. Scheehle's request to amend the caption because, given the length of the case and the number of officials originally named, there would be many such substitutions, and it is clear from the record that all current defendants were aware of their status as defendants in the action.[3]

Two weeks after this order was entered, Mr. Scheehle filed his objection to the four justices answering the certified question. We treat it as a motion to disqualify.

## ANALYSIS

In his objection, Mr. Scheehle asserts that the participation of the permanent members of this Court in this case

---

[3] Mr. Scheehle also filed documents in this Court in which he apparently requested that this Court update the caption. The questions certified to us are certified from the case in which they arose. We have no authority to alter the district court's caption.

6

is prohibited by two of the rules set forth in Canon 3(E) of the Arizona Code of Judicial Conduct. He alleges that the justices are disqualified from hearing the case because they are parties to it and are thus interested in it. Model Code of Jud. Conduct Canon 3(E)(1)(d)(i. He also alleges that they are biased and prejudiced with respect to the case. *Id.* at 3(E)(1)(a). In addition to these reasons, Mr. Scheehle asserts several other reasons for disqualification that are not related to the Code of Judicial Conduct. We examine each in turn.

## A. The Code of Judicial Conduct

### 1. Justices As Parties to the Proceeding

Canon 3(E)(1)(d)(i) requires a judge to "disqualify himself or herself in a proceeding in which . . . (d) the judge . . . (i) is a party to the proceeding." Mr. Scheehle argues that this canon admits of no exceptions and that if a judge is named as a defendant in an action, the judge is disqualified from hearing it.

Although we have no doubt that the canon requires such a result in the general run of cases, Mr. Scheehle is incorrect that it admits of no exceptions. This Court, in a similar factual context, has recognized at least one.

In *In re Ronwin*, Edward Ronwin, a repeatedly unsuccessful applicant to the Arizona bar, filed a number of civil rights and antitrust actions in federal court alleging that a conspiracy

7

existed to keep him from being admitted to the practice of law in this state. 139 Ariz. 576, 580-81, 680 P.2d 107, 111-12 (1983). Ronwin named the members of this Court as defendants in a number of those actions. *Id.* After filing the claims, Ronwin filed yet another application for admission to the Arizona bar. *Id.* Because "[t]he ultimate responsibility for admitting candidates for the practice of law is vested in" the supreme court, *id.* at 578, 680 P.2d at 109, we ruled on the application directly. In raising and discussing the ethical issues created by each justice's status as a defendant in the federal court actions, we noted:

> If we are to recuse ourselves simply because we have been sued by the applicant, then who is left to decide this case? As the Ninth Circuit stated: "'[A] judge is not disqualified merely because a litigant sues or threatens to sue him.' Such an easy method for obtaining disqualification should not be encouraged or allowed.'" *Ronwin v. State Bar of Arizona,* 686 F.2d at 701, *quoting United States v. Grismore,* 564 F.2d 929, 933 (10th Cir. 1977); *see also Smith v. Smith,* 115 Ariz. 299, 303, 564 P.2d 1266, 1270 (App. 1977). We agree; the mere fact that a judge has been sued by reason of his rulings in a case does not require recusal. Nor can the fact that all judges in the court have been sued require recusal. To honor such a technique would be to put the weapon of disqualification in the hands of the most unscrupulous.

*Id.* at 586, 680 P.2d at 117.

We thus decided that it was the obligation of the individual justices comprising this Court to decide on Ronwin's application, despite any possible appearance of impropriety. *Id.*

We did so, ultimately denying that application. *Id.* at 587, 680 P.2d at 118.

Even though in *Ronwin* we did not specially identify a doctrine that justified our decision to sit, such a doctrine, known as the rule of necessity, is widely applied by other jurisdictions. Although there are several formulations of the rule, a common one is that the rule of necessity will prevail over disqualification standards when it is not possible to convene a body of judges who are not subject to the disqualification standards. *United States v. Will*, 449 U.S. 200, 212 (1980); *Dacey v. Conn. Bar Ass'n*, 368 A.2d 125, 129 (Conn. 1976); *State v. Rome*, 685 P.2d 290, 296 (Kan. 1984); Jeffrey M. Shaman et al., *Judicial Conduct and Ethics* § 4.03, at 112 (3d ed. 2000) ("[D]isqualification must yield to necessity if recusal would thwart the only tribunal where relief [is] available.").

In *Ronwin* we concluded that because it was ultimately the responsibility of the supreme court to determine who could be admitted to the bar, the supreme court would have to answer the question. 139 Ariz. at 578, 680 P.2d at 109. Thus, practically, the permanent members of the Court could not recuse themselves.

Similarly in this case, Mr. Scheehle's suit requires a definitive interpretation of the scope of this Court's administrative authority to regulate the practice of law in this state. Such questions are inevitably questions of Arizona law.

9

This Court is the court of last resort on the interpretation of such questions. Ariz. Const. art. 3; *Hedlund v. Superior Court*, 171 Ariz. 566, 567, 832 P.2d 219, 220 (1992) (The supreme court has the final say on the interpretation of rules.). It is presumably for this reason that the legislature authorized only this Court to answer questions of state law certified by other jurisdictions. A.R.S. § 12-1861 ("The Supreme Court may answer questions of law certified to it by" federal and tribal courts involving dispositive questions of state law.). Mr. Scheehle's objection thus presents the same question this Court asked in *Ronwin*. "If we are to recuse ourselves simply because we have been sued by the applicant, then who is left to decide this case?" *Ronwin*, 139 Ariz. at 586, 680 P.2d at 117.

Although Mr. Scheehle does not raise the rule of necessity in his objection, and hence offers no argument why it should not apply, we have an independent ethical obligation to ensure that this exception to the general rule of disqualification does apply before sitting on this case. We note that there are some distinctions between this matter and *Ronwin*. Though the Court was called upon to exercise authority that ultimately rested with it, as we are here, the matter at issue in *Ronwin* did not also require the Court, as it does here, to determine the scope of its own authority. Moreover, the *Ronwin* Court did not consider whether each justice should recuse as the justices did the last time a

10

question was certified to this Court in this matter. Given that recusal is possible, it could be argued that it is not "necessary" that any single justice sit on this case, because a replacement can be appointed to sit in each justice's stead. Finally, in *Ronwin*, unlike the present case, the justices themselves were not parties to the matter they decided.

Courts in other jurisdictions have determined that when a litigant names each member of a state's highest court as a party to litigation challenging the court's authority or actions, and then moves to disqualify each member of the court from sitting on the case, the rule of necessity obliges the individual members of the court to sit. *See New York State Ass'n of Criminal Def. Counsel v. Kaye,* 744 N.E.2d 123 (N.Y. 2000) (holding that the rule of necessity required the individual judges of the New York Court of Appeals to serve even though they were named defendants in proceeding challenging capital fee structure promulgated by that court); *Vermont Supreme Ct. Admin. Directive No. 17 v. Vermont Supreme Court,* 576 A.2d 127, 132 (Vt. 1990) (determining that the rule of necessity required individual justices to serve even though they were named defendants in proceeding challenging administrative order that they had entered); *see also Office of State Ct. Adm'r v. Background Info. Servs.,* 994 P.2d 420, 425-26 (Colo. 1999) (upholding rule that required members of supreme court to sit in determining whether its own order restricting access to court

11

records was valid); *Rome*, 685 P.2d at 296 (determining that supreme court must sit even though it is interpreting its own authority); *Ex parte Farley*, 570 S.W.2d 617, 623 (Ky. 1978) (same); *Board of Overseers of the Bar v. Lee*, 422 A.2d 998, 1002 (Me. 1980) *appeal dismissed by* 450 U.S. 1036 (1981) (same); *Berberian v. Kane*, 425 A.2d 527, 527 (R.I. 1981) (same); *Cameron v. Greenhill*, 582 S.W.2d 775, 776 (Tex. 1979), *cert. denied*, 444 U.S. 868 (1979) (same); *State ex rel. Hash v. Mcgraw*, 376 S.E.2d 634, 638 (W. Va. 1988) (same). The rule of necessity applies even when there are provisions for a member of the court to be temporarily replaced in a matter. *See Kaye*, 744 N.E.2d at 128 ("The constitutional provision for the designation of substitute Judges is not to be used as a vehicle to force removal of the constitutionally appointed members of this Court by naming them as parties when challenging administrative actions of the Court.").

For the following reasons, we agree that the rule of necessity obliges us to sit in answering the questions certified in this case even though we are nominal parties to the action.

As Mr. Scheehle's complaint and subsequent motions indicate, he has sued the permanent members of this Court in their official capacities only. He does not argue that any of the four justices he seeks to disqualify has a personal stake in the litigation. When a justice has a personal conflict or is otherwise unable to serve, there is a procedure for the substitution of that

12

individual justice. Substitution based on individual considerations, however, is very different from an assertion that *every* sitting justice is disqualified by virtue of his or her position as a member of this Court.

If a permanent member of this Court being sued in an official capacity steps aside so that another judge can be appointed to sit, the person temporarily appointed then becomes a temporary member of this Court. That person thus suffers from the same infirmity, albeit on a temporary basis, that caused the permanent member's recusal. "[If] . . . the court could be regarded as an adversary of the petitioners, how would matters be any different if its regular members saw fit to vacate the bench? The special members appointed temporarily to replace them would still constitute that same court and, perforce, they too would be disqualified." *Farley,* 570 S.W.2d at 623; *see also Morgenthau v. Cooke,* 436 N.E.2d 467, 469 n.3 (N.Y. 1982) (finding use of substitutes for all members of the court would turn the substitutes into the Court of Appeals); *Vermont Supreme Court,* 576 A.2d at 132 (stating that "[s]ince the actions challenged in this proceeding were taken in our official capacity as the Vermont Supreme Court, the asserted disqualification to act cannot be eliminated simply by a temporary reconstitution of the Court").

Mr. Scheehle bases his objection, in part, on the operation of Federal Rule of Civil Procedure 25(d), which

13

automatically substitutes as defendants to a federal lawsuit successors in office to those public officials who are sued in their public capacities. Because Mr. Scheehle has sued the permanent members of this Court only in their official capacity, it appears that, should a member recuse or be disqualified, the temporary replacement would be substituted in by operation of the Rule. The replacement would thus also be subject to disqualification under the Rule.

Even if temporary successors were not automatically substituted in as parties, the reconstituted Court still could not address Mr. Scheehle's objections as set forth in his First Amended Complaint. That complaint alleges that "Arizona courts do not provide an impartial forum for litigating this cause because if Plaintiff is successful in his challenge of the System, Arizona judges may face a substantial increase in workload." Thus, even assuming the merit of Mr. Scheehle's objection, if any Arizona court would be incapable of answering the certified question without bias, it would not be possible, by appointing temporary replacements on this Court, to cure the basis of his objection.

Even assuming disqualification or recusal could cure the problem, it would create additional problems of constitutional dimension if the members of this Court recused for the reasons suggested by Mr. Scheehle. The Arizona Constitution specifies the qualifications for justices of this Court and the process by which

14

justices must be appointed and retained. Ariz. Const. art. 6, §§ 6, 36-38. The constitution further specifies the unique duties and prerogatives of this Court. These constitutional prerogatives involve both administrative responsibilities, Ariz. Const. art. 6 §§ 1, 3 (placing judicial power in an integrated judicial department and providing the supreme court with administrative supervisory authority over all lower courts), and the authority to interpret the law. Ariz. Const. art. 3 (creating a judicial department separate from executive and legislative departments). The constitution requires that those constitutional responsibilities be exercised by the justices appointed to this Court. A disqualification of all members of this Court based only on an asserted conflict that arises from each justices's performance of his or her constitutional function would be an abdication of duty by those who are constitutionally designated to perform such functions. Other courts have also recognized this problem. *See Kaye,* 744 N.E.2d at 126 ("If disqualification were required whenever the Judges were sued as individuals upon a challenge to an act of the Court, the result could be substitution of the entire constitutionally appointed court, leaving 'the most fundamental questions about the Court and its powers'" to be decided by persons who were not appointed to that purpose.); *Berberian,* 425 A.2d at 528 (Disqualifying the justices of the supreme court each time their administrative powers are challenged

15

would "render the rule-making process self-defeating and nugatory."); *Vermont Supreme Court,* 576 A.2d at 226 (finding substitution of all members of the court "leaves the most fundamental questions about the Court and its powers to persons whose selection and retention are not tested by constitutional processes").

Further, as we previously recognized in *Ronwin,* if disqualification were allowed in this case, it would provide litigants the ability to disqualify the membership of this entire Court merely by naming each member as a party. 139 Ariz. at 586, 680 P.2d at 117. "Such an easy method for obtaining disqualification should not be encouraged or allowed." *Id.*

This Court is regularly called upon to interpret or decide the validity of its own rules. *See, e.g., State ex rel. Napolitano v. Brown,* 194 Ariz. 340, 342, ¶¶ 6-8, 982 P.2d 815, 817 (1999) (rule granting 120 days to file a petition for post conviction relief upheld); *In re Smith,* 189 Ariz. 144, 146, 939 P.2d 422, 424 (1997) (upholding rule imposing mandatory continuing legal education); *Stapleford v. Houghton,* 185 Ariz. 560, 562, 917 P.2d 703, 705 (1996) (finding provision of Rules of Criminal Procedure superseded by Victim's Bill of Rights); *State v. Roscoe,* 185 Ariz. 68, 912 P.2d 1297 (1996) (same).

Our adoption of a rule does not constitute a prior determination that the rule is valid and constitutional against any

16

challenge. "[C]ourt rules and comments thereto cannot be given effect if they conflict with valid provisions of the constitution." *Stapleford,* 185 Ariz. at 562, 917 P.2d at 705. Such a determination awaits a judicial proceeding in which opposing interests are provided a full opportunity to be heard. *See, e.g., Kaye,* 744 N.E.2d at 127 (quoting *Vermont Supreme Court,* 576 A.2d at 30) ("[O]ur promulgation of the [rule] is not a prior determination that it is valid and constitutional. That determination must await the adjudication in this or a future case."). Both this Court and lower Arizona courts have upheld challenges to the validity of rules promulgated by this Court in such settings. *See, e.g., Stapleford,* 185 Ariz. at 560, 917 P.2d at 703; *Roscoe,* 185 Ariz. at 68, 912 P.2d at 1297; *State v. Uriarte,* 194 Ariz. 275, 981 P.2d 575 (App. 1998) (holding court rules must give way to statutes appropriately implementing constitutional provisions).

It is unusual, however, for the individual justices of this Court to be named as nominal defendants to a suit challenging a court rule. Declaratory judgment actions brought in state court challenging procedural or administrative rules of this Court do not require that the individual justices be named to obtain relief. Although Mr. Scheehle's § 1983 action brought in federal court presumably does require that a public official be named, Mr. Scheehle named a number of officials, including the superior court judge who enforced the rule and imposed the sanction against

17

him.  Presumably, therefore, he did not have to name each justice of this Court as a defendant to obtain the relief identified in his complaint.[4]  That he did so, however, does not, under these facts, require our disqualification.  The rule of necessity mandates our individual participation in responding to the questions certified. *See Will*, 449 U.S. at 214.

## 2.  Bias and Prejudice

Mr. Scheehle alleges that each of the four permanent justices should be disqualified because each is already committed to a view on the certified questions.  This partiality, according to Mr. Scheehle, constitutes bias or prejudice sufficient to disqualify the justices pursuant to Canon 3(E)(1)(a), which specifies that "[a] judge shall disqualify himself or herself in a proceeding . . . where . . . the judge has a personal bias or prejudice concerning a party or a party's lawyer."

The objection asserts that the bias of the justices is clear because of "the pleadings and papers filed over the past

---

[4]    Opinion 96-14 of the Arizona Supreme Court Judicial Ethics Advisory Committee, entitled "Limitations on Disqualification Requirement," November 21, 1996, posits that if a disinterested but informed observer would conclude that suit was brought against a judge solely to disqualify the judge from presiding over litigation, the judge is not disqualified, so long as the judge feels that he or she can fairly preside over the case. We need not decide whether a disinterested but informed observer would make such a determination as to Mr. Scheehle's suit against the individual members of this Court because we conclude that the rule of necessity requires the permanent members to sit in answering the certified questions.

18

seven years or so by the defendants in [this action] (which include, of course, the four justices in question)." Even assuming that the pleadings filed by the Attorney General representing all the defendants could be attributed for purposes of this motion to represent the views of each of the permanent members of this Court, three of the four justices (Berch, Ryan and Hurwitz) are relatively recent appointees to the Court, and Mr. Scheehle suggests no pleading filed during the time of their service on the Court that would suggest that any of them has a preconceived view on the issue.

The only specific pleading mentioned in the objection is the brief filed by defendants with our reconstituted supreme court when the Ninth Circuit first certified a question to us in this same proceeding in 2002. According to Mr. Scheehle, in that pleading the defendants took the position that the supreme court "had the inherent power to require the attorneys it regulates to serve as arbitrators." Because Justice McGregor was a member of the Court at that time, Mr. Scheehle asserts that the defendants' position can be attributed to her for purposes of establishing her personal bias. There are both legal and factual problems with this argument.

As a matter of law, even if Mr. Scheehle could establish that any of the justices has a view on the question at issue, such an allegation does not constitute the kind of bias or prejudice

19

required for disqualification under the canon. Canon 3(E)(1)(a) specifies that disqualification is appropriate when "the judge has a personal bias or prejudice concerning a party or a party's lawyer." "Bias and prejudice means a hostile feeling or spirit of ill-will . . . towards one of the litigants. The fact that a judge may have an opinion as to the merits of the cause or a strong feeling about the type of litigation involved, does not make the judge biased or prejudiced." *State v. Perkins*, 141 Ariz. 278, 286, 686 P.2d 1248, 1256 (1984) (quoting *State v. Myers*, 117 Ariz. 79, 86, 570 P.2d 1252, 1259 (1977) (quoting *In re Guardianship of Styer*, 24 Ariz. App. 148, 151, 536 P.2d 717, 720 (1975))); Shaman et al., *supra*, § 4.04, at 113 ("However, neither bias nor prejudice refer to the attitude that a judge may hold about the subject matter of a lawsuit . . . . That a judge has a general opinion about a legal . . . matter that relates to the case before him or her does not disqualify a judge from presiding over the case.") (citations omitted); *see also* Leslie W. Abramson, *Judicial Disqualification Under Canon 3 of the Code of Judicial Conduct* 24 (2d ed. 1992) ("Only personal bias or prejudice constitutes a disqualifying factor.").

Thus, Mr. Scheehle's allegation that the four permanent justices already have a view about the questions certified does not constitute a basis for disqualification even if it could be established.

And, even as a factual matter, Mr. Scheehle is unable to establish such a pre-existing view. When the supreme court or other departments of the State require representation, they obtain that representation from the Attorney General's office. For cases involving the supreme court, the legal representation is coordinated with the Chief Justice. Only he was aware of the position taken by the defendants in this case. That is the basis for his own recusal in this matter. As the New York Court of Appeals noted in *Kaye*, "[i]t is not an uncommon practice for the Chief [Justice] alone to be recused in similar appeals involving judicial administration." 744 N.E.2d at 125 n.1.

Neither Justice McGregor nor any of the other justices who are challenged by Mr. Scheehle's motion took any role in the defense, nor were they aware of the positions or theories advocated by the State before the State's papers were filed. Mr. Scheehle challenges the validity of a court rule, names each of the individual justices as nominal party defendants, and then asserts that any answer or argument advanced by the State in favor of the validity of the rule must be attributed to each of the justices for the purpose of establishing his or her individual bias. In cases in which the rule of necessity requires the permanent members of this Court to sit on a question, and the justices have taken no role in the preparation of the defense, such an attribution cannot be made. The rule of necessity itself requires such an

21

accommodation. *Cf.* Disqualification Concerns When the Attorney General's Office Represents Judges, Op. 02-05 Ariz. Supreme Ct. Jud. Ethics Advis. Comm. (Sept. 12, 2002) (While normally a judge should recuse from hearing a case in which the Assistant Attorney General representing him in other matters appears before him, "if the lawyer currently represents *all* judicial officers in the county or state (e.g., in a challenge to entire court's authority or an attack on a judicial policy or rule), the 'rule of necessity' may prevail, making disqualification impractical and unnecessary.").

## B. Other Arguments for Disqualification

In addition to these arguments, Mr. Scheehle also briefly argues that the individual justices should recuse because (1) he has filed a complaint against the individual justices with the Arizona Commission on Judicial Conduct resulting from their failure to recuse themselves in this matter, and (2) the named defendant justices previously recused themselves when a question was earlier certified in this same matter.

## 1. Complaint to the Commission on Judicial Conduct

Mr. Scheehle asserts that the individual justices are disqualified from deciding this matter because he has filed a complaint against each of them with the Commission on Judicial Conduct resulting from their failure to recuse.

As far as we can discern, every state that has considered the question, including Arizona, has determined that a complaint to

22

the Commission on Judicial Conduct alone does not require recusal. "The mere fact that a complaint has been made against a judge alleging the judge is biased and cannot be impartial does not require automatic disqualification or recusal by the judge. If this were so any party or attorney could easily disrupt court proceedings at any time by filing a complaint against the judge." Disqualification Considerations When Complaints Are Filed Against Judges, Op. 98-2 Ariz. Supreme Ct. Jud. Ethics Advis. Comm. (Mar. 24, 1998) (quoting Shaman et al., *Judicial Conduct and Ethics* § 4.06 (2d ed. 1995)); *see also* Op. No. 98-04 Wash. Ethics Advis. Comm. (Apr. 20, 1998); Op. 45 Calif. (Jan. 23, 1997).

Thus, Mr. Scheehle's complaint against the justices with the Commission on Judicial Conduct does not alone merit disqualification.

## 2. The Justices Previously Recused in this Matter

Mr. Scheehle correctly asserts that when the Ninth Circuit previously certified a question to us in this matter, the five permanent justices then on the Court all recused themselves. The recusal did not come as a result of an objection brought by Mr. Scheehle. Each justice recused on his or her own motion. We have no record of their reasons for recusal. Even when the canons do not require recusal, a judge may recuse from judicial duties. *Zuniga v. Superior Court*, 77 Ariz. 222, 224, 269 P.2d 720, 721 (1954) ("A judge may on his own motion, if he acts timely, recuse

23

himself even though the reason given might not be sufficient to form the basis of a legal disqualification.").

We do not now question the decision of each of the members of this Court at that time to recuse themselves. Nor are we bound by that decision. It is, however, our determination for the reasons set forth above that Mr. Scheehle presents no legal or factual argument requiring the disqualification of all four permanent justices, merely because the last time a question was certified in this matter each individual justice chose to recuse.

## CONCLUSION

We recognize that each justice in this case has a continuing individual responsibility to exercise "considerable introspection and intellectual honesty," in determining whether he or she may appropriately sit upon any matter that comes before the Court. Op. 98-2 Ariz. Supreme Ct. Jud. Ethics Advis. Comm. (Mar. 24, 1998). Such an evaluation depends on considerations that may be unique to each justice and cannot be evaluated or discussed in this collective opinion. Apart from such individual considerations, however, we here determine that Mr. Scheehle has set forth no arguments in his objection that would compel disqualification of any of the four justices from sitting on the certified questions. Therefore,

24

**IT IS ORDERED**, denying Scheehle's motion to disqualify.

_____

G. Murray Snow, Judge[5]

CONCURRING:

_____

Ruth V. McGregor, Vice Chief Justice

_____

Rebecca White Berch, Justice

_____

Michael D. Ryan, Justice

_____

Andrew D. Hurwitz, Justice

_____

[5] The Honorable Charles E. Jones recused himself, pursuant to Article 6, Section 3 of the Arizona Constitution. The Honorable G. Murray Snow, Judge of the Court of Appeals, Division One, was designated to sit in his stead.

25